IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

EON CORP. IP HOLDINGS,
LLC,

Plaintiff,

v.

AT&T MOBILITY LLC, ET AL.,

Defendants.

CIV. NO.: 11-1555(FAB/SCC)

## REPORT AND RECOMMENDATION

Two of the defendants in this patent suit, AT&T Inc. ("ATT") and AT&T Mobility LLC ("ATTM"), move the court to dismiss the claims against them for lack of personal jurisdiction. *See* Docket Nos. 39, 77; *see also* Fed. R. Civ. P. 12(b)(2). The presiding district judge referred this case to the undersigned for all pre-trial management, Docket No. 51, and, after hearing oral argument, *see* Docket No. 113, we issue the following report and recommendations regarding the defendants' motions.

## I. Personal Jurisdiction Standard

We note, first, that because this is a patent case, we apply the law of the Federal Circuit, rather than the First Circuit, to the personal jurisdiction inquiry. *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1377 (Fed. Cir. 1998). A district court has personal jurisdiction over a foreign defendant where the long-arm statute of the state in which that court sits "permits the assertion of jurisdiction without violating federal due process." *Id.* at 1376–77. Puerto Rico's long-arm statute has been interpreted coextensively with the constitution, and therefore the two inquiries collapse into a consideration of constitutional due process. *See Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 29 (1st Cir. 1988) (noting that Puerto Rico's long-arm statute stretches "'up to the point of the constitution'" (quoting *Indus. Siderugica v. Thyssen Steel Caribbean, Inc.*, 14 P.R. Offic. Trans. 708)). Under the constitution, the relevant consideration is "whether the defendant purposefully established 'minimum contacts' with the forum state." *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

Where the personal jurisdiction inquiry is "based on affidavits and other written materials in the absence of a

jurisdictional hearing, a plaintiff need only to make a" prima facie case that personal jurisdiction exists. *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003). In such a situation, the court "must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor." *Id.*

Precedent recognizes two forms of personal jurisdiction: specific and general. To establish specific jurisdiction, a plaintiff must satisfy a three-part test by showing: (1) that the defendant "purposefully directed" its activities towards the forum state; (2) that the cause of action "arises out of" those activities; and (3) that the exercise of jurisdiction is constitutionally reasonable. *Akro Corp. v. Luker*, 45 F.3d 1541, 1546–1549 (Fed. Cir. 1995). The test for general jurisdiction is stricter and requires a showing that the defendant has "contacts with the forum state that qualify as 'continuous and systematic general business contacts.'" *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1018 (Fed. Cir. 2009) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)).

## II.  ATTM's Motion to Dismiss

ATTM maintains that it has insufficient minimum contacts with Puerto Rico for either general or specific jurisdiction to

attach. Docket No. 39. Plaintiff's complaint treats the AT&T defendants collectively, maintaining that they "continuously and systematically conduct[] business in Puerto Rico" by operating here as a wireless provider, among other things. Docket No. 49, ¶¶ 4–6. ATTM contradicts these allegations through a declaration by Rebecca Guerrios, general counsel for co-defendant AT&T Mobility Puerto Rico, Inc. ("ATTM-PR"). Docket No. 39-1. Guerrios's declaration states that ATTM is "not authorized to sell or provide, nor does it sell or provide, any . . . services of any kind" in Puerto Rico. *Id.* ¶ 6. Indeed, Guerrios declares that ATTM "does not do *any* business in the Commonwealth of Puerto Rico" and accordingly has no employees, distributors, or property here. *Id.* ¶ 8 (emphasis added).

Plaintiff Eon IP Holdings Corp. presents an array of documentary evidence to contradict ATTM's declaration and thereby make out a prima facie case for personal jurisdiction. Most relevant, in our view, is the copy of the contract that Puerto Rico residents must sign in order to obtain cellular phone services from AT&T.[1] This contract, titled "Wireless

---

**1.**   Here we mean AT&T the brand.

Customer Agreement," defines the relationship between a Puerto Rico customer and what the contract itself calls "AT&T." The contract defines "AT&T" as "AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates doing business as AT&T." Docket No. 54-3, at 26. ATTM argues that the "acting on behalf" language means that the contract is *really* with ATTM-PR, the "FCC-licensed affiliate doing business as AT&T" in Puerto Rico. Docket No. 73, at 4 ("[I]t is the 'FCC-licensed affiliates' (here, ATTM-PR), and *not* ATTM, who enter into the Agreement. . . ."). But even if ATTM-PR is also a party to the contract, ATTM's position is belied by the contract's own language: ATTM is "acting on behalf" of ATTM-PR; it is therefore *acting*, in Puerto Rico, for other AT&T-branded entities. ATTM, then, is a party to Puerto Rico AT&T customers' contracts,[2] and though it is correct that this fact alone is

---

**2.**   ATTM presents no evidence to rebut Plaintiff's argument regarding the contract. Instead, it relies only on an interpretation of the contract's language that we find to be rebutted by the contract itself, which expressly states that ATTM is a party. Thus, Plaintiff's factual allegations with regard to the contract "must be taken as true." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed. Cir. 1994).

We also find compelling the fact that ATTM has previously treated similar contractual language as giving *it*, and not any of its affiliates, the right to compel arbitration. For example, in one brief it wrote that

insufficient to establish personal jurisdiction, *see Burger King*, 471 U.S. at 478 (holding that a contract alone cannot establish minimum contacts), there is more here than a mere contract.

First, there is the number: Centennial Communications Corp., the company that became ATTM-PR, had some 440,000 customers in Puerto Rico before its merger with ATT. Docket 54-4, ¶ 7. ATTM is a party to each of these customer's contracts. Moreover, with regard to each of these customers, ATTM has availed itself of Puerto Rico law by including in the contract a provision stating that Puerto Rico law will govern. Docket No. 54-3, at 43; *see Burger King*, 471 U.S. at 482 (noting, in finding that personal jurisdiction existed, that the defendant had "purposefully availed himself of the benefits and protections of [the forum state's] law by entering into contracts expressly providing that those laws would govern"). The contract likewise contains an arbitration clause. Docket No. 54-3, at 29; *see Mountbatten Sur. Co., Inc. v. Reagerharris Inc.*, No. 99-3052, 2000 WL 39063, at *6 (E.D. Pa. Jan. 18, 2000) (treating an

---

it was made up of five different constituent companies, but then went on to argue that it had a right to compel arbitration despite not mentioning *which* of those companies its customers were doing business with. *See* Brief of Defendant-Appellant at 1 & n.1, *Laster v. AT&T Mobility LLC*, No. 08-56934 (9th Cir. Jan. 5, 2009).

arbitration clause like a choice-of-law provision for the purposes of personal jurisdiction).

Perhaps most importantly, a customer's signing this contract is, in the words of Plaintiff's counsel, a "condition precedent" to the purchase of an AT&T-branded phone or the initiation of AT&T-branded wireless services. Significantly, then, ATTM "act[s] on behalf" of its affiliates, and a phone is sold or service is initiated: the contract is signed, and products or services are delivered "into the stream of commerce with the expectation that they will be purchased by consumers in the forum [s]tate." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980). And by contracting with residents of Puerto Rico in order to initiate the delivery of products or services into the stream of commerce, ATTM also takes "an action . . . purposefully directed toward the forum state." *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 107 (1987).

In *Nuance*, the Federal Circuit considered a similar situation. There, plaintiff sued Abbyy USA as well as another company, Abbyy Production, a foreign corporation registered in Russia. *Nuance*, 626 F.3d at 1228. Abbyy Production sought dismissal for want of personal jurisdiction. *Id.* at 1229. The Federal Circuit found that specific jurisdiction existed with

regard to Abbyy Production on the basis of an agreement between it and Abbyy USA that allowed Abbyy USA to sell Abbyy Production's products in the United States. *Id.* at 1230. Even though Abbyy Production had not directly entered the forum's market, the court found that jurisdiction existed because it had "made [its] products available for sale through an established distribution chain, and the cause of action for patent infringement [was] alleged to arise out of these activities." *Id.* at 1234. Likewise, here, though the relationship between ATTM and ATTM-PR has "yet to be fully explored through discovery," *id.* at 1230, what we know is that ATTM's contracting with Puerto Rico residents, on behalf of ATTM-PR, made "products [and/or services] available for sale" in the forum state. The allegations of patent infringement that animate this case arise out of the products and services that the contract placed into the stream of commerce. Present, then, are acts on the part of the defendant directed toward the forum state having a factual nexus to the case's claims. *See Akro*, 45 F.3d at 1546–1549. "No more is necessary for specific jurisdiction."[3] *Nuance*, 626 F.3d at 1234; *see also Beverly Hills Fan Co. v.*

---

**3.** The exercise of specific jurisdiction must, of course, be reasonable. *See Akro Corp. v. Luker*, 45 F.3d 1541, 1546–1549 (Fed. Cir. 1995). However,

*Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed. Cir. 1994) ("The allegations are that the defendant shipped the accused fan into Virginia through an established distribution channel. The cause of action for patent infringement is alleged to arise out of these activities. No more is usually required to establish specific jurisdiction.").[4]

---

ATTM has presented no evidence or argument to suggest that jurisdiction here would be particularly unreasonable despite it being its burden to do so. *See Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1363 (Fed. Cir. 2006) (noting that the defendant has the burden of showing that the exercise of specific personal jurisdiction would be unreasonable). In any case, the reasonableness factor is "minimally relevant" to the jurisdictional analysis. *Id.*

**4.** In *Beverly Hills Fan*, plaintiff sued Ultec, a Chinese corporation, for patent infringement. 21 F.3d at 1560. Ultec argued that the district court did not have personal jurisdiction over it because Ultec had no assets, employees, agent, or license to do business in the forum state, *id.*, much like ATTM here. But Ultec, the manufacturer of the infringing product, did have a distribution relationship with another company that then distributed products that ended up in the forum state. *Id.* The court found that this was sufficient to establish personal jurisdiction because Ultec's relationship with its distributor sent products into an established distribution channel and it was foreseeable that they would arrive in the forum. *Id.* at 1565. Here, the issue isn't manufacture, and it isn't even simply the shipping of goods: it's the provision of both goods and mobile services. ATTM's role in contracting for those services puts those services into an established distribution chain that leads to alleged infringement in Puerto Rico.

Here, though, we believe that there are sufficient facts to support even general jurisdiction. The sheer number of contracts that ATTM has entered into in Puerto Rico is, we think, sufficient to constitute "continuous and systematic business contacts." *Helicopteros*, 466 U.S. at 416. Add to that the fact that, for example, ATTM holds itself out as offering to its customers (and here we mean its stateside customers) nation-wide coverage that includes Puerto Rico, such that when an ATTM customer flies from New York to San Juan, his or her service continues with no complexity or confusion. *See, e.g.*, Docket No. 54-3, at 34 (defining its nationwide network to include "the United States, Puerto Rico, and" the United States Virgin Islands); Docket Nos. 54-10, 54-11 (maps showing "AT&T Mobility" coverage in Puerto Rico). Similarly, the AT&T website's wireless services page, as viewed by a Puerto Rico customer seeking to buy a phone or initiate service, states, "Service provided by AT&T Mobility."[5] *See* Docket No. 54-5;

---

**5.** ATTM argues that "AT&T Mobility," as used on this page (without "LLC" appended), is a reference to a brand, not to ATTM. We find this explanation unconvincing: first, corporations, not brands, provide services; second, ATTM *does* contract with Puerto Rico residents; and third, ATTM has previously referred to this website as its own. *See, e.g.*, Brief of Defendant-Appellant at 10, *Laster v. AT&T Mobility LLC*, No. 08-56394 (9th Cir. Jan. 5, 2009). This is a different question than who

*see also Campbell Pet Co. v. Miale*, 42 F.3d 879, 884 (Fed. Cir. 2008) (holding that a website that targets goods or services at residents of a forum may support the exercise of personal jurisdiction). ATTM objects to the relevance of each piece of this evidence, and it is right that no single piece would, itself, support the exercise of jurisdiction. For example, a website that is merely viewable in the forum does not support jurisdiction, but this one offers goods and services. Likewise, neither a roaming agreement or coverage maps are sufficient to establish jurisdiction, but here, ATTM holds itself out as providing wireless services in Puerto Rico.[6] ATTM's contacts with Puerto

---

maintains the website, which we understand to be two different AT&T-affiliated corporations.

**6.** Roaming agreements are insufficient to establish personal jurisdiction. *See, e.g., Cmty. Voice Line, L.L.C. v. MetroPCS Commc'ns, Inc.*, No. 11-4019(MWB), 2011 U.S. Dist. LEXIS 19350, *5 (N.D. Ia. Feb. 25, 2011) ("[E]very court to consider the question has held that "roaming" agreements are not sufficient to establish personal jurisdiction over a cellular service provider . . . ."). However, the inference we draw from the maps, the website, and the agreements is that ATTM is responsible, at least in part, for operating a nationwide network that also provides services in Puerto Rico. Moreover, ATTM has not presented any evidence suggesting that this was a simple roaming agreement. Indeed, prior to Centennial Communications becoming ATTM-PR, AT&T customers benefitted from a roaming agreement with Centennial, but one of the supposed benefits of the Centennial-AT&T merger was that

Rico are continuous and significant. The court's exercise of general personal jurisdiction therefore would be reasonable.

Accordingly, we recommend that ATTM's motion to dismiss, Docket No. 39, be DENIED.

### III.    ATT's Motion to Dismiss

For similar reasons to ATTM, ATT seeks dismissal for want of jurisdiction. Docket No. 77. By way of a declaration from Steven Threlkeld, Executive Director of Finance for AT&T Services, Inc., ATT presents evidence that it is a holding company that does "no business directly with the public." Docket No. 77-1, ¶ 3. It states further that it does not own any of the equipment that makes up a telecommunications network, nor does it maintain any such network. *Id.* With regard

---

the AT&T network would, post-merger, extend seamlessly from the mainland to Puerto Rico, and the roaming arrangement would end. *See* Docket No. 83-6, ¶ 6 (declaration of ATT executive explaining that, after the merger, "roaming payments . . . will be eliminated"); *see also id.* ¶ 14 ("[C]ustomers who live in areas served by Centennial's wireless network but not by AT&T's wireless network will have access to additional services following the merger."). And we note, too, that ATTM's odd statements to the contrary notwithstanding, *see, e.g.,* Docket No. 73, at 5, we are certainly permitted to draw reasonable inferences from the evidence before us. *See Autogenomics, Inc. v. Oxford Gene Tech. Ltd.,* 566 F.3d 1012, 1018 (Fed. Cir. 2009) (noting that a plaintiff is "entitled" to the reasonable inferences that can be drawn from its evidence).

to Puerto Rico specifically, the declaration states that ATT has no employees, property, distributors, representatives, or agents, nor is it licensed to do business, here. *Id.* ¶¶ 5, 7. As with ATTM's motion, Eon relies on a substantial amount of documentary evidence in its effort to contradict the Threlkeld declaration. Most compellingly, Eon presents an array of public filings by ATT that point to its direct role in negotiating a merger with Centennial Communications Corp. in Puerto Rico.

In 2008, ATT and Centennial entered into a merger agreement. *See* Docket No. 83-2, at 6. Under the agreement, a wholly-owned subsidiary of ATT would merge with and into Centennial, "with Centennial continuing as the surviving corporation," which would itself become a wholly-owned subsidiary of ATT (and which is now ATTM-PR). *Id.* at 7. At the time of the merger, Centennial had more than 400,000 customers in Puerto Rico. Docket No. 54-5, ¶ 7. As part of the merger process, ATT applied to the Federal Communications Commission to have Centennial's licenses transferred. Docket No. 83-8. It is true that these applications were made on behalf of ATT's subsidiaries (though the applications name ATT as the transferee), but it is also undisputed that ATT itself entered into the merger agreement and made these applications.

Moreover, ATT's senior executives were intimately involved in the planning, negotiation, and execution of the merger. *See, e.g.*, Docket No. 83-6 (declaration of ATT executive stating that he was involved in the "strategic and business decisions" leading up to the merger). Likewise, ATT committed its operating subsidiaries in Puerto Rico to certain conduct as a prerequisite to the Department of Justice's approval of the merger. *See, e.g.*, Docket No. 83-14, at 4 (committing to honor Centennial's existing roaming agreements and to maintain a CDMA network in Puerto Rico for eighteen months after the merger's closing date);[7] *see also ACORN v. Household Int'l, Inc.*, 211 F. Supp. 2d 1160, 1166 (N.D. Cal. 2002) (finding that personal jurisdiction was appropriate over defendant parent

---

**7.** The letter making this commitment is on the letterhead of AT&T Services, Inc., and the letter itself speaks generically of "AT&T." Docket No. 83-14, at 2. However, the letter is titled "*AT&T Inc.* and Centennial Communication Corp. Applications for Consent to Transfer Control of Licenses . . . ." *Id.* (emphasis added). We therefore think it is reasonable to infer, especially given the fact that ATT was generally responsible for negotiating this merger, that it was ATT itself that was committing its subsidiaries to this course of action. Furthermore, the FCC interpreted these commitments as being made by ATT, and it approved the license transfer application on that basis. *See* Docket No. 83-2, at 3 ("We grant today the application of AT&T Inc. . . . *subject to the imposition of conditions embodying certain voluntary commitments made by AT&T* [*Inc.*]." (emphasis added)).

company where it "had the authority and inclination to commit its subsidiaries" to various policies).

In addition to its contacts with Puerto Rico through its involvement in the Centennial merger, Eon presents evidence tending to show that ATT has done business here. For example, one FCC filing related to the license-transfer process states that, before the Centennial merger, ATT "lack[ed] a wireline network presence in Puerto Rico (other than a node and submarine cable assets)." Docket No. 83-16, at 4. The only inference to be drawn from this statement is that before the merger ATT *did* own a node and submarine cable assets in Puerto Rico, and we do not think the Threlkeld declaration's general statement that ATT is a pure holding company is sufficient to rebut this direct admission. *See Elecs. for Imaging*, 340 F.3d at 1349 (directing courts to resolve factual conflicts in favor of the plaintiff). Much more significantly, prior to the Centennial merger ATT provided management services under an agreement with América Móvil, then a wireless carrier doing business in Puerto Rico. *See* Docket No. 83-2, at 5.  ATT also had the right to appoint two members of América Móvil's corporate board, *id.*, and it regularly put its own high-ranking executives in that position. *See* Docket No. 83-18, at 7 (listing

ATT executives placed on the América Móvil board). By placing these executives on América Móvil's board, ATT "provided advice and assistance" to América Móvil. *Id.* at 9. Notably, the FCC found that the two companies' relationship was significantly close that, given the Centennial merger, it might have created anti-competitive harms, and it therefore prohibited ATT from providing services to América Móvil as a condition to approving ATT's license-transfer application. Docket No. 83-2, at 9.

Eon's uncontradicted evidence, then, shows that ATT and its executives engineered and carried out a merger with a company in Puerto Rico that added over 400,000 subscribers to the AT&T network. Prior to the merger, moreover, ATT provided various services in Puerto Rico, including assistance in the management of América Móvil and ownership of a node and submarine cable assets. And, generally, ATT's filings with the FCC show that it controlled what products and services AT&T customers in Puerto Rico would receive, regardless of which subsidiary ultimately provided them. *See, e.g.*, Docket No. 83-2, at 7; Docket No. 83-6, at 4–5 (declaration of ATT executive discussing what rate plans and phones former Centennial customers in Puerto Rico would have available to

them); *see also ACORN*, 211 F. Supp. 2d at 1166. All of this, of course, results in ATT deriving substantial revenue every year from its subsidiaries' and affiliates' business in Puerto Rico. *See uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 428–29 (7th Cir. 2010) (noting that where a corporation has derived millions of dollars from thousands of contracts with forum residents, its contacts with the forum "cannot fairly be described as random, fortuitous or attenuated," even where it did not specifically target the forum state's residents).

ATT began merger negotiations with Centennial, a company with a significant presence in Puerto Rico; subsequently received approval of that merger and transferred Centennial's licenses and assets to itself, its affiliates, and its subsidiaries; and substantially increased its own revenue by doing so. By these actions, ATT "deliberately reached out beyond" its headquarters to establish significant business contacts with Puerto Rico. *Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp.*, 394 F. Supp. 2d 299, 310 (D. Mass. 2005); *see also Quill Corp. v. North Dakota*, 504 U.S. 298, 307 (1992) ("[I]f a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State, it may subject itself to the State's *in personam* jurisdiction even if it has no physical

presence in the State."). Courts have regularly held that merger
negotiations can constitute actions directed towards a forum
state for the purposes of personal jurisdiction, especially
where, as here, the merger agreement affected the forum state.
*See Wolverine*, 394 F. Supp. 2d at 309–10.[8] Because these merger
negotiations resulted in the transfer to ATT of wireless-
network-related assets, out of which arise Eon's infringement
claims, the contacts are sufficient to establish specific personal
jurisdiction over ATT.[9] *See Nuance*, 626 F.3d at 1234; *Elecs. for*

---

**8.** *See also, e.g., Osborne v. German*, No. 11-744(CAB), 2012 U.S. Dist. LEXIS
39762, *10 (N.D. Ohio March 23, 2012) ("Mere [merger] negotiations
may subject a non-resident to personal jurisdiction if the provisions of
the negotiated agreement would have affected" the forum state.); *In re
Stillwater Capital Partners Inc. Litig.*, No. 11-2737(SAS), 2011 U.S. Dist.
LEXIS 29703, *27–28 (S.D.N.Y. March 5, 2012) (finding that defendant's
activities in negotiating a merger in the forum constituted sufficient
contacts for personal jurisdiction); *Am. Bank Holdings, Inc. v. Grange
Mut. Cas. Co.*, No. 09-2228(DKC), 2010 U.S. Dist. LEXIS 55597, *12–15
(D. Md. June 7, 2010) (same); *G&G LLC v. White*, 535 F. Supp. 2d 452,
462 (D. Del. 2008) (same); *cf. Senanayake v. Rodli*, No. 08-210(VPC), 2009
U.S. Dist. LEXIS 74144, *10–11 (D. Nev. Aug. 12, 2009) (holding that
personal jurisdiction did not exist because the merger agreement would
not have affected the forum state).

**9.** Though we do not make a specific recommendation on this point, we
think that ATT's contacts with Puerto Rico might even be sufficient to
establish general jurisdiction. ATT's merger negotiations, its licenses
and assets, and its relationship with América Móvil, all show that ATT

*Imaging*, 340 F.3d at 1351 (holding that a patent-infringement claim arises out of a defendant's contacts with a forum where those contacts relate to the allegedly-infringing technology); *Genetic Implant Sys. v. Core-Vent Corp.*, 123 F.3d 1455, 1458–59 (Fed. Cir. 1997) (holding that where a company has derived economic benefit, even if indirect, from the use of its allegedly-infringing technology in the forum state, specific personal jurisdiction may be proper); *Beverly Hills Fan*, 21 F.3d at 1565.[10]

---

has been closely involved in the Puerto Rico wireless-services market for a number of years. This industry does not have a small economic footprint on the island, and ATT's involvement in it has not been minor or fleeting. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

**10.** An interesting and analogous situation is presented by *Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998). There, plaintiff sued CFM, a semi-conductor manufacturer, and CFMT, its wholly-owned subsidiary and intellectual property holding company. *Id.* at 1267. CFMT sought dismissal for want of jurisdiction, and the district court granted its motion, finding that CFMT had no employees, agents, or property in the forum state and that neither the revenue it received related to CFM's activities nor its actions in attempting to negotiate a license in the forum were sufficient to establish jurisdiction. *See id.* at 1268–69. The Federal Circuit reversed, finding that CFMT's actions related to the patent-in-suit, namely its threats of lawsuits, combined with the revenue that it received from the forum and its licensing of its technologies to CFM, which did operate in the forum, were sufficient for personal jurisdiction. *Id.* at 1271. The Circuit added that "the parent-subsidiary relationship between CFM and CFMT leads to the

Like ATTM, ATT does not seriously argue that the exercise of specific personal jurisdiction in Puerto Rico would be constitutionally unreasonable and neither do we find it to be so.

Accordingly, we recommend that ATT's motion to dismiss for want of personal jurisdiction, Docket No. 77, be DENIED.

## IV.    Conclusion

After reviewing the parties' briefing, arguments, and evidence, we conclude that Eon has stated a prima facie case for personal jurisdiction against both ATT and ATTM, neither of whom have presented sufficient, uncontradicted evidence of their unamenability to suit in Puerto Rico. Consequently, and for all of the reasons stated above, we recommend that the court DENY both motions to dismiss currently under consideration. *See* Docket Nos. 39, 77.

IT IS SO RECOMMENDED.

---

conclusion that the imposition of personal jurisdiction over CFMT is 'reasonable and fair.'" *Id.* Here, too, ATT has, at the least, directed the conduct of its affiliates with respect to the allegedly-infringing technologies, and it has profited significantly from doing so. Even without piercing the corporate veil, we can note the relevance of the companies' relationship in this regard. *See id.* at 1271 n.3 (noting that the plaintiff admitted that the companies' parent-subsidiary relationship was "legally proper" and that he therefore did not seek to pierce the corporate veil).

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 2nd day of April, 2012.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE