IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

EON CORP., IP HOLDINGS, LLC,

**Plaintiff**,

v.

AT&T MOBILITY, LLC; AT&T
MOBILITY PUERTO RICO, INC.;
AT&T, INC.; PUERTO RICO
TELEPHONE COMPANY, INC.;
TELECOMUNICACIONES DE PUERTO
RICO, INC.; TELEFONICA DE PUERTO
RICO, INC.

**Defendants**.

**CIVIL NO.** 11-1555 (FAB)

**OPINION AND ORDER**[1]

BESOSA, District Judge.

Before the Court is the Report and Recommendation ("R&R"), (Docket No. 120), regarding defendants' motions to dismiss: one filed by defendant AT&T Mobility, Inc. ("ATT-M"), (Docket No. 39), and the other, filed by AT&T, Inc. ("ATT-I"), (Docket No. 77). Having considered the magistrate judge's recommendations, as well as defendants' objections to the R&R, (Docket Nos. 127 & 128), plaintiff Eon Corp.'s ("Eon") opposition to defendants' objections, (Docket Nos. 130 & 131), and defendants' replies in support of their objections, (Docket Nos. 138 & 139), the Court **ADOPTS IN PART**

---

[1] Jared Killeen, a second-year student at Brooklyn Law School, assisted in the preparation of this Opinion and Order.

and **REJECTS IN PART** the findings and recommendations of the magistrate judge.

## I.   Procedural and Factual Background

On June 14, 2011, plaintiff Eon, a Texas-based limited liability company, brought a patent suit against defendants. (Docket Nos. 1 & 49.)  Eon alleges that it holds several patents to mobile technologies used or sold by defendant ATT-I and its subsidiaries, ATT-M and AT&T Mobility Puerto Rico, Inc. ("ATT-MPR").  (Docket No. 49 at ¶¶ 18-44.)  In short, plaintiff alleges that by knowingly infringing upon these patents, defendants illegally enhance the wireless communication and entertainment services they provide to their subscribers in Puerto Rico.  Id.

The merits of plaintiff's claim, however, are not at issue. Rather, defendants ATT-M and ATT-I contest this Court's exercise of personal jurisdiction.[2]  On November 28, 2011, ATT-M filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) ("Rule 12(b)(2)").  (Docket No. 39 at p. 3.)  ATT-M maintains that it is a limited liability corporation owned by various subsidiaries of ATT-I, that it is incorporated in Delaware, and maintains its principal place of business in Atlanta, Georgia.  Id. at p. 2.

---

[2] Defendant ATT-MPR, whose primary place of business is Puerto Rico, does not contest the Court's exercise of personal jurisdiction.

Moreover, ATT-M contends that ATT-MPR, and not ATT-M, is the sole authorized provider of AT&T-branded wireless service within Puerto Rico, that ATT-M is merely a remote corporate cousin of ATT-MPR and, moreover, that ATT-M itself maintains no contacts whatsoever within the Commonwealth. Id. at p. 13.

Like ATT-M, defendant ATT-I filed a motion to dismiss on January 12, 2012, contending that ATT-I is a holding company incorporated in Delaware with its principal place of business in Dallas, Texas. (Docket No. 77 at p. 3.) ATT-I also maintains that it does not make or market any goods or services, that the named AT&T-related defendants are separate and distinct corporate entities, and that ATT-I itself has no presence in Puerto Rico. Id. at pp. 2-3. In essence, both ATT-M and ATT-I disclaim substantial relation to ATT-MPR and deny any connection whatsoever to the Commonwealth.

On December 12, 2011, plaintiff submitted a response to ATT-M's motion to dismiss, along with a variety of evidence demonstrating the latter's business contacts with Puerto Rico. (Docket No. 54.) On January 9, 2012, ATT-M submitted a reply in support of its motion to dismiss, again averring that only ATT-MPR provides service to AT&T's wireless customers in Puerto Rico. (Docket No. 73 at p. 3.) Plaintiff also submitted a memorandum in

opposition to ATT-I's motion to dismiss on January 30, 2012. (Docket No. 83.)

Magistrate Judge Silvia Carreño-Coll issued an R&R concerning defendants ATT-M and ATT-I's motions to dismiss on April 2, 2012. (Docket No. 120.)  Regarding ATT-M, the magistrate judge found sufficient facts to support general jurisdiction.  Id. at p. 10. Accordingly, the magistrate judge recommends that ATT-M's motion to dismiss be denied.  Id. at p. 12.  Regarding ATT-I, the magistrate judge found that the exercise of specific jurisdiction to be constitutionally reasonable.  Id. at p. 20.  Though ATT-I is a holding company, and ostensibly does "no business directly with the public," the magistrate judge found substantial evidence showing business contacts between ATT-I and Puerto Rico.  Id. at p. 12. For this reason, the magistrate judge recommends that the Court deny ATT-I's motion to dismiss as well.  Id. at p. 20.

On April 16, 2012, in response to the R&R, both ATT-M and ATT-I submitted vociferous objections.  (Docket Nos. 127 & 128.) First, ATT-M argued that the magistrate judge erred in finding sufficient facts to support general jurisdiction. (Docket No. 128 at pp. 3-9.)  For good measure, ATT-M also maintained that it is not subject to specific jurisdiction in Puerto Rico, either.  Id. at pp. 9-14.  Like ATT-M, defendant ATT-I argued that the magistrate judge erred in recommending that the Court exercise

specific jurisdiction, because ATT-I is merely a holding company and maintains no business contacts in Puerto Rico. (Docket No. 127 at p. 1.)

On May 2 and 3, 2012, plaintiff submitted responses to defendants ATT-M and ATT-I's objections to the R&R. (Docket Nos. 130 & 131.) With regard to the objections filed by ATT-M, plaintiff maintained that personal jurisdiction is justified. (Docket No. 130 at pp. 6-14.) Plaintiff also introduced new evidence of ATT-M's contacts with Puerto Rico. (Docket Nos. 130-1, 130-2, & 130-3.) Regarding the objections submitted by ATT-I, plaintiff mounted a number of arguments, maintaining that despite its status as a holding company, ATT-I has considerable business contacts within the Commonwealth. (Docket No. 131.)

Finally, on May 31, 2012, ATT-M and ATT-I submitted replies in support of their objections to the R&R. (Docket Nos. 138 & 139.) ATT-M once more contested the appropriateness of general jurisdiction, stalwartly maintaining that it sells no products or services in Puerto Rico. Id. at pp. 5-7. Similarly, ATT-I again reiterated its objections to the Court's exercise of personal jurisdiction, pointing still again to its status as a holding company and declaiming any substantive business contacts within the Commonwealth. (Docket No. 138.)

The Court considers defendants' objections to the R&R in turn. We begin with ATT-M, which objects to the magistrate judge's recommendation that general jurisdiction is reasonable; we then turn to ATT-I, which protests the proposed exercise of specific jurisdiction. In each case, we consider the plethora of supporting documents filed by the parties. For reasons that will be discussed presently, the Court holds that specific jurisdiction is appropriate for both ATT-M and ATT-I.

## II. Legal Standards

### A.    Standard under 28 U.S.C. § 636(b)(1)

A district court may refer a case to a magistrate judge for a report and recommendation. See 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Loc. Rule 72(b). Any party adversely affected by the report and recommendation may file written objections within fourteen days of being served with the magistrate judge's report. See 28 U.S.C. § 636(b)(1). A party that files a timely objection is entitled to a de novo determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." Sylva v. Culebra Dive Shop, 389 F.Supp.2d 189, 191-92 (D.P.R. 2005) (citing United States v. Raddatz, 447 U.S. 667, 673 (1980)). Failure to comply with this rule precludes further review. See Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992). In conducting its review, the court is

free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636 (a)(b)(1). <u>Templeman v. Chris Craft Corp.</u>, 770 F.2d 245, 247 (1st Cir. 1985); <u>Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.</u>, 286 F.Supp.2d 144, 146 (D.P.R. 2003). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object. <u>See Hernandez-Mejias v. Gen. Elec.</u>, 428 F.Supp.2d 4, 6 (D.P.R. 2005) (citing <u>Lacedra v. Donald W. Wyatt Detention Facility</u>, 334 F.Supp.2d 114, 125-126 (D.R.I. 2004)).

**B.    Standard under Rule 12(b)(2)**

Pursuant to Rule 12(b)(2), a defendant may move for the dismissal of a claim based on lack of personal jurisdiction. F.R.C.P. 12(b)(2). Once personal jurisdiction is challenged, it is the plaintiff who bears the burden of "establishing that jurisdiction exists over the nonresident defendant." <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 50 (1st Cir. 2002). In a patent case, the jurisdictional inquiry is "intimately involved with the substance of the patent laws" and thus the law of the United States Court of Appeals for the Federal Circuit applies. <u>Elec. For Imaging, Inc. v. Coyle</u>, 340 F.3d 1344, 1348 (Fed. Cir. 2003) (quoting <u>Akro Corp. v. Luker</u>, 45 F.3d 1541, 1543 (Fed. Cir. 1995). Under Federal Circuit law, and in the

absence of an evidentiary hearing, a plaintiff need only make a *prima facie* showing that defendants are subject to personal jurisdiction. Id. at 1349; Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1347 (Fed. Cir. 2002). Furthermore, the Court must accept as true the uncontroverted allegations in the plaintiff's complaint and resolve all factual conflicts in the plaintiff's favor. Id.

**C.   Personal Jurisdiction Standard**

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment limits the power of a court to render a valid personal judgment against a nonresident defendant. Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2853 (2011); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980). Pursuant to Federal Circuit law, the Court's jurisdictional reach is further limited by the forum's long-arm statute. LSI Indus., Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1371 (Fed. Cir. 2000). Because the Puerto Rico long-arm statute extends personal jurisdiction to the outer bounds permitted by the Fourteenth Amendment, the exercise of jurisdiction by the Court is limited only by judicial Due Process analysis. Id.; Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1990). In its decision in Int'l. Shoe Co. v. State of Wash., the Supreme Court held that pursuant to the Fourteenth Amendment, courts may exercise personal

jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  326 U.S. 310, 316 (1945) (internal quotations omitted).  Since then, Int'l. Shoe has provided the basic template for personal jurisdiction analysis.

Following Int'l. Shoe, however, the Supreme Court has further sharpened its analysis by distinguishing between two kinds of personal jurisdiction:  general and specific.  See Goodyear Dunlop, 131 S.Ct. at 2854; Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); Perkins v. Benquet Consol. Mining Co., 342 U.S. 437 (1952).  On the whole, "specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction plays a reduced role."  Goodyear Dunlop, 131 S.Ct. at 2853 (quoting Twitchell, The Myth of General Jurisdiction, 101 Harv.L.Rev. 610, 628 (1988)).  First, a court may assert general jurisdiction over an out-of-state corporation only when its contacts with the forum are so "continuous and systematic" as to render it essentially at home in the state.  Goodyear Dunlop, 131 S.Ct. at 2851 (quoting Int'l. Shoe, 326 U.S. at 317).  Indeed, in matters of general jurisdiction the corporation's activities in the forum are so continuous and substantial as to "justify suit against it on causes of action arising from dealings entirely

distinct from those activities." Id. at 2853 (quoting Int'l. Shoe, 326 U.S. at 318). Accordingly, it is a stringent standard by which a court evaluates the propriety of general jurisdiction, and a standard that is rarely met. Harlow v. Children's Hosp., 432 F.3d 50, 64 (1st Cir. 2005); see Perkins, 342 U.S. 437 (the one instance in which the Supreme Court has found general jurisdiction over a nonresident corporation to be warranted).

Specific jurisdiction, on the other hand, is proper when there exists a relationship between the forum and the underlying controversy. Goodyear Dunlop, 131 S.Ct. at 2851. When the contacts between a corporation and the forum are fairly limited, as is often the case, the Court may inquire whether there is "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 245 (1958). See World-Wide Volkswagen, 444 U.S. at 287; Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985); Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty., 480 U.S. 102, 105 (1987). Thus, a court may assert specific jurisdiction over a nonresident corporation "where an alleged injury arises out of or relates to actions by the defendant [itself] that are purposefully directed toward forum residents, and where jurisdiction would not otherwise offend fair play and

substantial justice." <u>Burger King Corp.</u>, 471 U.S. at 463.  When a defendant's contacts with the forum are sufficient, jurisdiction may not be avoided simply because the defendant did not physically enter the forum.  <u>Id.</u>

## III. Personal Jurisdiction Analysis

### A.    ATT-M

Defendant ATT-M objects to the magistrate judge's finding that there are sufficient facts to support general jurisdiction. (Docket No. 120 at p. 10.)  ATT-M protests that plaintiff has failed to demonstrate the existence of continuous and systematic contacts between ATT-M and Puerto Rico that render the former at home here.  <u>Id.</u>  Indeed, as ATT-M points out, the general jurisdiction standard is difficult to meet.  <u>Campbell Pet Co. v. Miale</u>, 542 F.3d 879, 882 (Fed. Cir. 2008); <u>Ubid, Inc. v. GoDaddy Group, Inc.</u>, 623 F.3d 421, 426 (7th Cir. 2010).  Thus, for the reasons set forth below, the Court concedes that general jurisdiction is inappropriate in this case, but nonetheless finds sufficient cause to exercise specific jurisdiction and to deny ATT-M's motion to dismiss.  We consider in turn both forms of jurisdiction and their appropriateness to this case.

### i.    General Jurisdiction

ATT-M objects to the magistrate judge's determination that this Court is entitled to exercise general

jurisdiction over it.   Id.   ATT-M's objection rings true even
despite three compelling instances of substantial business contacts
between ATT-M and Puerto Rico.   First, and most intriguing, is a
contract--or "wireless customer agreement" ("WCA")--between ATT-M
and Puerto Rico resident Juan R. Rivera-Font ("Rivera").   (Docket
No. 54-2.)   The WCA includes a balance statement for wireless
service, instructions to send payment to ATT-M's corporate address
in Atlanta, GA, and an arbitration agreement invoking Puerto Rico
law.   Id.   According to the magistrate judge, WCAs define
relationships between ATT-M and approximately 440,000 residents of
Puerto Rico[3] by which ATT-M purposefully engages those residents
within the forum.[4]   (Docket No. 120 at p. 4.)   Moreover, the
magistrate judge found that by contracting with residents of Puerto
Rico, ATT-M initiates delivery of products and services into the

---

[3] Plaintiff also submitted an affidavit by Daniel Scardino, a
Texas lawyer familiar with the 2009 merger between AT&T and
Centennial Communications Corp. ("Centennial") that eventually led
to the creation of ATT-MPR.   Scardino states that at the time of
its conception, ATTM-PR had contracts with some 440,000 customers
in Puerto Rico.   (Docket No. 54-4 at ¶ 7.)   It follows, then, that
ATT-M is party to each of these customers' WCAs.

[4] In its reply in support of its motion to dismiss, ATT-M
avers in regard to the WCA that it is merely "acting on behalf of
its FCC-licensed affiliates doing business as AT&T," and that only
ATT-MPR provides service to AT&T's wireless customers.   (Docket
No. 73 at p. 3.)   No doubt the magistrate judge makes short work of
ATT-M's rather sophistic protestation, noting that, even if this is
so, ATT-M still very much *acts* in the Commonwealth of Puerto Rico.
Id. at p. 5.

Civil No. 11-1555 (FAB)                                                    13

Puerto Rico "stream of commerce." Id. at p. 7; see Asahi Metal, 480 U.S. 102; World-Wide Volkswagen, 444 U.S. at 298. Second among its apparent contacts with Puerto Rico is ATT-M's offer to provide stateside customers with coverage in the Commonwealth so that "when an ATT-M customer flies from New York to San Juan, his or her service continues with no complexity or confusion." Id. at p. 10; see Docket No. 54-2 at pp. 6-7. And third, the magistrate judge found that contacts arise when the ATT-M wireless page of the AT&T Web site specifically targets customers in Puerto Rico. Id.

The magistrate judge noted that no single piece of this evidence would support the exercise of general jurisdiction. Id. at p. 11. But the magistrate judge found that the WCAs, the offer of stateside service, and the Web site together demonstrate ATT-M's continuous and systematic business contacts within the forum state and warrant the exercise of general jurisdiction. Id. at p. 12. We disagree. The Court of Appeals for the Federal Circuit has cautioned that "the degree of contact with the forum that is necessary to establish general jurisdiction is quite high." Campbell Pet Co., 542 F.3d at 882. Even considering the combined evidence of business affiliations between ATT-M and Puerto Rico, we find that plaintiff fails to meet the demanding standard. The Court will examine each piece of evidence in turn.

First, we consider the WCAs between ATT-M and the 440,000 residents of Puerto Rico.  In her R&R, the magistrate judge stated that the "sheer number of contracts that ATT-M has entered into in Puerto Rico is, we think, sufficient to constitute 'continuous and systematic contacts.'"  (Docket No. 120 at p. 10.) ATT-M argues that, even assuming it has WCAs with 440,000 residents of Puerto Rico, "neither the number of contracts nor the revenue received therefrom [sic] is sufficient to show that [ATT-M] is essentially at home in Puerto Rico for jurisdictional purposes." (Docket No. 128 at p. 4.)  The Court agrees with ATT-M.  Typically, *de minimis* purchase or sales transactions between a nonresident defendant and the forum state are insufficient to establish general jurisdiction.  See Helicopteros Nacionales, 466 U.S. at 416-18 (finding that the regular purchase of helicopters, equipment, and training services for substantial sums was not enough to warrant the assertion of general jurisdiction over a nonresident corporation); Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico, 563 F.3d 1285, 1291 (Fed. Cir. 2009) (finding that limited sales and purchases between defendant and forum did not establish general jurisdiction); Campbell Pet Co., 542 F.3d at 884 (finding that two percent of defendant's sales in forum state was insufficient to warrant general jurisdiction); Ubid, Inc., 623 F.3d at 426 (holding that the marketing and sale of registrations for

Internet domain names, as well as numerous contracts with customers in the forum, did not justify the exercise of general jurisdiction over a nonresident corporation).  While the considerable revenue that ATT-M must derive from these contracts is likely greater than that found in Synthes, Campbell Pet Co., or uBid,[5] the general amount of commercial activity conducted between ATT-M and Puerto Rico is no more than what is present in Helicopteros Nacionales. Measured against that case, the facts here are unimpressive. Accordingly, sales contracts between ATT-M and Puerto Rico residents, no matter their multitude, do not constitute the continuous and systematic contacts required to warrant general jurisdiction.

          To bolster her analysis, the magistrate judge evoked the "stream-of-commerce" theory, a mainstay of jurisdictional jurisprudence since the Supreme Court's decision in Asahi Metal, 480 U.S. 102.  According to the R&R, the contracts between ATT-M and 440,000 residents of Puerto Rico facilitate the delivery of

---

          [5] When its contracts in the Commonwealth are viewed as a percentage of its *total revenue*, ATT-M may be said to conduct *less* business in Puerto Rico than the Campbell Pet Co. defendants conducted in the state of Washington.  In Campbell Pet Co., general jurisdiction was deemed improper when defendants made two percent of their sales in the forum state.  Considering that the 440,000 WCAs in Puerto Rico comprise not even *a tenth of a percent* of ATT-M's total 78 million wireless contracts, it becomes clear that ATT-M's business in Puerto Rico is relatively insubstantial.  (See Docket No 83-2 at p. 4.)

products or services "into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." (Docket No. 120 at p. 7) (internal quotation marks omitted.) In this way, the magistrate judge finds, ATT-M purposefully directs its actions toward residents of Puerto Rico. Id. (citing Asahi Metal, 480 U.S. at 107.) No matter how availing this argument may be, however, the magistrate court's stream-of-commerce analysis "elides the essential difference" between specific and general jurisdiction. Goodyear Dunlop, 131 S.Ct. at 2849. The flow of a defendant's products or services into the forum may bolster an affiliation relevant to *specific jurisdiction*, "but ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant." Id. This is because a corporation's continuous activity within a forum is not enough to support the notion that the corporation be amenable to suits unrelated to that activity. Id. (citing Int'l. Shoe, 326 U.S. at 318.) Therefore, the magistrate judge errs in applying a stream-of-commerce theory to her general jurisdiction analysis.

Next, we consider the fact that ATT-M offers stateside customers wireless coverage in Puerto Rico. ATT-M denies that its offer constitutes a business contact with the Commonwealth. (Docket No. 128 at p. 6.) Rather, ATT-M argues that

its "offer" merely assures stateside customers that they will receive services in Puerto Rico provided by ATT-MPR, an entirely separate corporate entity.[6]  Id.  Without peering any closer at ATT-M's relationship with ATT-MPR, the Court finds unpersuasive the magistrate judge's finding that ATT-M's offer to provide stateside customers with service in Puerto constitutes a contact with the forum.  While ATT-M's reassurances that stateside customers will receive coverage in Puerto Rico clearly underscores ATT-M's general provision of service there, such statements are undeniably directed to *stateside customers,* and not to residents of the Commonwealth.  By offering uniform service to stateside customers, ATT-M is *not* purposefully reaching out to residents of Puerto Rico.  It is enough to say that ATT-M's offer to provide non-residents of Puerto Rico with wireless coverage in the Commonwealth reveals only what is already evident: that ATT-M is directly or indirectly concerned with providing AT&T's wireless service in Puerto Rico.  This fact has been made quite clear by ATT-M's undisputed contracts with

---

[6]  Nonetheless, by passing the buck to ATT-MPR, ATT-M inadvertently concedes that it does in fact do business with a corporate entity in Puerto Rico. ("Thus, any offer that [ATT-M] may make to stateside customers for coverage in Puerto Rico can arise only from a business arrangement between [ATT-M] and [ATT-MPR] that ensures that ATT-MPR will provide wireless services in Puerto Rico to stateside customers." (Docket No. 128 at p. 10.)) That admission is certainly relevant when performing the *specific jurisdiction* analysis, even though it may not be relevant in a general jurisdiction analysis.

440,000 residents of Puerto Rico; that ATT-M offers similar
services to other customers visiting Puerto Rico sheds no new light
on the matter.

         Finally, we consider ATT-M's objection to the
magistrate judge's contention that ATT-M, via the AT&T Web site,
specifically targets Commonwealth customers.[7]  (Docket No. 120 at
p. 10.)  Citing Campbell Pet Co., the magistrate judge noted that
an interactive Web site that targets goods or services at residents
of a forum may support the exercise of personal jurisdiction.  Id;
Campbell Pet Co., 42 F.3d at 884.[8]  That ATT-M acts via the AT&T
Web site is clear enough from the wireless service page, which

---

[7] ATT-M denies that it uses the site to sell goods and
services in Puerto Rico, pointing out that the site is "generally
available to anyone who has access to the Internet."  (Docket
No. 128 at p. 10.)

[8] Contrary to the magistrate judge's intimation, however, the
Court in Campbell Pet Co. found that the defendant's Web site did
*not* target residents of the forum, and therefore that the Web
site's activity was insufficient to give rise to general
jurisdiction.  42 F.3d at 884.  In Campbell Pet Co., the Court held
that a Web site fails to establish general jurisdiction if it is
not specifically directed at the forum state, "but instead is
available to all customers throughout the country who have access
to the Internet."  Id.  Moreover, "[T]he ability of [forum]
residents to access defendants' [Web sites] . . . does not by
itself show any persistent course of conduct by the defendants in
the forum."  Id. (quoting Trintec Indus., Inc. v. Pedre Promotional
Prod., Inc., 395 F.3d 1275 (Fed. Cir. 2005)).

states, "Service provided by AT&T Mobility."[9]  (Docket Nos. 120 at

p. 10; 54-5).  But whether the site interactively targets residents

of Puerto Rico, and whether this warrants the exercise of general

jurisdiction, are separate questions altogether.  The first matter

before the Court, then, is whether the AT&T Web site is

sufficiently interactive to target customers in Puerto Rico.  We

find that it is.

There exists no reliable standard by which to

measure the "interactivity" of a commercial Web site; nor is there

an easy way to ascertain whether a site targets a particular forum.

Nonetheless, a number of circuit and district court cases provide

some useful instruction.  In general, these cases have found that

interactive targeting exists where a defendant is clearly doing

business through its Web site in the forum state.  See

CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1075 (9th

---

[9] ATT-M denies that the appearance of the "AT&T Mobility"
brand on the AT&T Web site proves that ATT-M uses the Web site to
sell goods and services to residents of Puerto Rico.  (Docket
No. 128 at p. 10.)  ATT-M also contends that the "AT&T Mobility"
brand is used by many AT&T-branded companies, including ATT-MPR,
which unlike ATT-M is the only true provider of goods and services
in the Commonwealth.  Id. at pp. 6-7.  But ATT-M declines to
acknowledge the fact that the Web site makes available WCAs to
which ATT-M is a party, and, moreover, that "AT&T Mobility" is
identified on the Web site as a service provider according to the
coverage maps for Puerto Rico.  (Docket No. 130 at p. 13.)  Given
the clear and abundant evidence that ATT-M is concerned with
providing wireless service to customers in Puerto Rico via WCAs,
the Court finds defendant's argument unavailing.

Cir. 2011) (holding that continuous commerce via a Web site may justify personal jurisdiction); Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 451-55 (3rd Cir. 2003) (holding that the Web site must be "designed or intended" to reach the forum state); ALS Scan v. Digital Serv. Consultants, Inc., 293 F.3d 707, 714 (4th Cir. 2002) (holding that the Web site must show manifested intent of engaging in business or other interactions in the forum); Neogen Corp. v. Neo Gen. Screening, Inc., 282 F.3d 883, 890 (6th Cir. 2002) (holding that the purposeful availment requirement is satisfied if the Web site is interactive to a degree that reveals specifically intended interaction with residents of the forum); CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1264-66 (6th Cir. 1996) (holding that the Web site's interactivity reflects specifically intended interaction with residents of the forum); Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119, 1124 (W.D.Pa. 1997) (requiring that the defendant is clearly doing business through it Web site and the claim relates to or arises out of use of the site).

        In light of these cases, there remains little doubt that the AT&T Web site is "designed and intended" to reach the forum of Puerto Rico, Toys "R" Us, 318 F.3d at 454, and that its interface reflects specifically intended interaction with forum residents. CompuServe, 89 F.3d at 1264-66. First, the Web site is

highly interactive.   (Docket Nos. 54-5; 130 at p. 12.)   For example, it allows a resident of Puerto Rico to enter electronically into a WCA; it also permits customers to order products and services for delivery in the Commonwealth.   Id. Moreover, the Web site appears to target residents of Puerto Rico specially.   The site makes reference to a resolution process specific to Puerto Rico and invokes Puerto Rico law.   Id.   It also specifically lists the ATT-M service plans available in Puerto Rico and goes so far as to modify the mailing-address form to include "urbanizations" and "residenciales," a type of address peculiar to Puerto Rico (Docket Nos. 83-11; 130 at p. 12.)   Though the Web site is "generally available to anyone who has access to the Internet," (Docket No. 128 at p. 12), it is more than just a passive site, and encourages interactive commercial activities with its users.

        The second, and more difficult, question is whether the Web site's interactivity warrants general jurisdiction over ATT-M.   The Court finds that it does not.   In reaching this conclusion, we bear in mind the sobering ramifications of exercising general jurisdiction over a nonresident corporation based on its Web site. As the Ninth Circuit Court of Appeals notes, the standard for general jurisdiction "is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for

any of its activities anywhere in the world." CollegeSource, Inc., 653 F.3d at 1074 (quoting Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801 (9th Cir. 2004) (internal quotations omitted). These considerations are all the more urgent when dealing with a commercial Web site. Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 35-36 (1st Cir. 2010); CollegeSource, Inc., 653 F.3d at 1075. Indeed, interactive Web sites where a user can exchange information with a corporation are extremely common. CollegeSource, Inc., 653 F.3d at 1075 (citing Zippo Mfg. Co., 952 F.Supp. at 1124). If the activities of an interactive commercial Web site were enough to support general jurisdiction in every forum in which users interacted with the Web site, we would soon face the inevitable demise of all restrictions on the personal jurisdiction of the courts. Id. at pp. 1075-76 (quoting World-Wide Volkswagen, 444 U.S. at 286) (internal quotations omitted). See also Dagesse v. Plant Hotel N.V., 113 F.Supp.2d 211, 217 (D.N.H. 2000); Millennium Enter. v. Millennium Music, 33 F.Supp.2d 907, 910 (D.Or. 1999). Therefore, case law concerning interactive Web sites has tended to set the jurisdictional bar quite high. See Campbell Pet Co., 42 F.3d at 884 (holding Internet sales of $14,000 insufficient for general jurisdiction); Revell v. Lidov, 317 F.3d 467, 471 (5th Cir. 2002) (holding subscription sales to be insufficient for general jurisdiction); Bird v. Parsons, 289 F.3d 865, 873-74 (6th Cir.

2002) (holding that 4,666 Internet domain-name registrations insufficient for general jurisdiction). We find no reason to stray from established precedent: ATT-M's activities, conducted via the AT&T Web site, are insufficient to warrant general jurisdiction.

We note again the magistrate judge's admission that alone, no single piece of this evidence would support the exercise of general jurisdiction--but that together, they are sufficiently compelling. (Docket No. 120 at p. 11.) Again, we must disagree. Even when considered together, the evidence enumerated above is insufficient to meet the stringent general jurisdiction standard. In support of this assertion, we need look only to the canonical decision in Perkins, in which the Supreme Court found reason to grant general jurisdiction over a nonresident corporation. 342 U.S. 437. In Perkins, a Philippine mining corporation conducted a "continuous and systematic" part of its general business in Ohio. Id. at 438. The corporation's president maintained his office in the state, kept the company's files in that office, and supervised work plans from there. Id. at 447. Moreover, the corporation carried on continuous activities in the forum state, including "directors' meetings, business correspondence, banking, stock transfers, payment of salaries, purchasing of machinery, etc. . . ." Id. at 445. When held up against Perkins, the facts in this case pale. As ATT-M avers, and

plaintiff fails to contest, ATT-M has no employees in the forum, rents no offices and owns no property here, pays no taxes in Puerto Rico, and is not registered to do business in the Commonwealth. (Docket No. 138 at p. 4.)  Granted, the world today is not the world of Perkins; a modern telecommunications corporation may easily establish affiliations within a forum state without ever setting up an office there.  While this may seem at first glance like good reason to exercise general jurisdiction over ATT-M, such an approach would render defendants susceptible to suit in any forum no matter how unrelated the claim might be to the corporation's activities there.  Simply put, a loose exercise of general jurisdiction would act to eviscerate the jurisdiction requirement itself.  Therefore, the Court **REJECTS** the magistrate judge's findings that general jurisdiction may be appropriately exercised over ATT-M.

   **ii.  Specific Jurisdiction**

        ATT-M also contends that it is not subject to specific jurisdiction.  (Docket Nos. 128 at pp. 13-18; 139 at pp. 8-14.)  The Court of Appeals for the Federal Circuit applies a three-prong test when determining whether the application of specific jurisdiction satisfies the requirements of Due Process. Breckenridge Pharm., Inc. v. Metabolite Lab., Inc., 444 F.3d 1356, 1362-63 (Fed. Cir. 2006); Akro Corp., 45 F.3d at 1545.  The Court

must examine whether:  (1) the defendant purposefully directed its activities at residents of the forum; (2) the claim arises out of, or relates to, those activities; and (3) assertion of personal jurisdiction is reasonable and fair.  <u>Id.</u>  We address each prong in turn, relying upon the relevant analysis performed above, and conclude that ATT-M is properly subject to specific jurisdiction.

### a.   **Purposefully Directed Activity**

ATT-M objects that it has not purposefully directed any activity toward residents of Puerto Rico.  (Docket No. 128 at p. 13.)  While admitting that it has entered into WCAs with Commonwealth customers, ATT-M contends that a contract between a resident and nonresident alone is not enough to show that a defendant deliberately engaged in activities in the state.  <u>Id.</u>; <u>see</u> <u>Burger King Corp.</u>, 471 U.S. at 478.  Instead, ATT-M argues that the terms of the agreement must also create a "continuing obligation" between the defendant and the resident.  <u>Id.</u> at pp. 14-17; <u>see</u> <u>Burger King Corp.</u>, 471 U.S. at 475-76.  Unsurprisingly, ATT-M disclaims any continuing obligation to its customers in Puerto Rico, averring that it is ATT-MPR, and not ATT-M, that provides products and services to AT&T subscribers.  <u>Id.</u> at p. 14. In the same breath, ATT-M argues that in no way does it deliver any goods or services into the stream of commerce, and that at most ATT-M and ATT-MPR have an agreement by which ATT-MPR provides "its

own services" to customers in the Commonwealth.  <u>Id.</u> at pp. 14-16.
For the reasons set forth below, we find ATT-M's argument
unsatisfactory.

To begin with, ATT-M strains too hard in
asserting that a continuing obligation is required to show directed
activity.  This assertion arises from an intentional misreading of
<u>Burger King Corp.</u> that conveniently lops off the head of the
relevant sentence while keeping only its tail; in full, the
sentence reads:

> Thus where the defendant *deliberately has engaged in*
> *significant activities within the State* or has created
> continuing obligations between himself and the forum, he
> manifestly has availed himself of the privilege of
> conducting business there, and . . . it is presumptively
> not unreasonable to require him to submit to the burdens
> of litigation in that forum . . . . 471 U.S. at 475-76
> (internal quotations and citations omitted; emphasis
> added).

The disjunctive nature of the entire sentence indicates that a
defendant may either deliberately engage in significant activities
*or* create continuing obligations.  We find that ATT-M has in fact
done both, though this amounts to a myopic reading of the text.  If
we are to stay true to the analysis in <u>Burger King Corp.</u>, we must
adopt the broader and "highly realistic" approach that considers
*all* factors in the relationship between a nonresident and the forum
state.  <u>Id.</u> at 479.  Here, we find three primary factors in
determining whether ATT-M purposefully directed activity toward the

forum:  ATT-M's contracts with residents of Puerto Rico, its relationship with ATT-MPR, and the activity of the AT&T Web site directed at customers living in the Commonwealth.

First, ATT-M undisputedly enters into numerous contracts with residents of Puerto Rico.  The magistrate judge put this number somewhere around 440,000.  (Docket Nos. 120 at p. 4; 54-4 at ¶ 7.)  According to the sworn statement submitted by Neal S. Berinhout, associate general counsel for ATT-M, "all customers must agree to a WCA that sets forth or incorporates by reference the terms and conditions of service" as a condition of receiving wireless service from ATT-M.   (Docket No. 130-2 at p. 5.) Moreover, customers are directed to make payment for those services to ATT-M's headquarters in Atlanta, GA.  (Docket No. 54-2 at p. 11.)  Though Burger King Corp. holds that a single contract between a nonresident defendant and a resident does not automatically establish minimum contacts, 471 U.S. at 478, surely 440,000 contracts, established over the course of several years, is sufficient to do so.  Additionally, ATT-M *does* indeed demonstrate continuing obligations to its contracted customers in Puerto Rico by including in its WCA a Puerto Rico-specific arbitration clause and, moreover, by providing ongoing customer service to resolve concerns and complaints.  (Docket 130-2 at pp. 2-3; see Burger King Corp., 471 U.S. at 482 (holding that a choice-of-law provision may

be considered as showing deliberate affiliation with a forum state)).  Given the multitude of the WCAs between ATT-M and residents of Puerto Rico, and the ongoing obligations that arise from these contracts, the nature of the relationship between ATT-M and the forum "can in no sense be viewed as random, fortuitous, or attenuated." Id. at 480 (citing Hanson, 357 U.S. at 253; Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984); World-Wide Volkswagen Corp., 444 U.S. at 299).

Second, ATT-M clearly maintains a business relationship with ATT-MPR, an AT&T subsidiary with its principal place of business in Puerto Rico. (Docket Nos. 49 at ¶ 12; 128 at pp. 15-16.)  ATT-M is quick to point out that this relationship is "undefined," but it cannot hide the fact that it comprises some sort of "agreement" with ATT-MPR. (Docket No. 128 at pp. 15-16.) For instance, ATT-M states that "any offer that [ATT-M] may make to stateside customers for coverage in Puerto Rico can arise only from a business arrangement between [ATT-M] and [ATT-MPR] that ensures

that [ATT-MPR] will provide wireless services in Puerto Rico to stateside customers."[10]  Id. at p. 10.

ATT-M relies on Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc. to argue that for the purpose of personal jurisdiction, doing business with a company that does business in a state is not the same as doing business in that state.  148 F.3d 1355, 1361 (Fed. Cir. 1998).  This is undoubtedly true in the context of Red Wing Shoe Co., but given the facts of this case, that an argument is unavailing.  In Red Wing Shoe Co., the court found insufficient contacts between the defendant and the forum state when a number of the defendant's licensees sold products in that state.  Id. at 1357-58.  None of the licensees, however, was incorporated in the forum or had its principal place of business there.  Id. at 1358.  Moreover, the defendant had no dealings with its licensees in that state.  Id.  This case, however, may be easily distinguished from Red Wing Shoe Co.  In contrast to Red

---

[10] There is some plangent dispute about whether ATT-M's relationship with ATT-MPR may be properly analyzed pursuant to the "stream of commerce" theory. (See Docket Nos. 120 at p. 7; 128 at p. 15.)  We decline to address this matter largely because it is unnecessary to do so.  For the purpose of establishing minimum contacts, it is enough that ATT-M contracts with residents of Puerto Rico, maintains a substantial business relationship with ATT-MPR in the forum, and conducts business via the AT&T Web site specifically targeted at customers in the Commonwealth; thus, we need not determine whether ATT-MPR acts as a distribution channel for goods or services produced by ATT-M.

Wing Shoe Co., ATT-M's relationship with ATT-MPR is predicated on ATT-MPR's activity in the forum, where ATT-MPR has it principal place of business.   Indeed, according to ATT-M, its business arrangement with ATT-MPR ensures that ATT-MPR will provide wireless services in Puerto Rico.   (Docket No. 128 at p. 10.)   Several courts have found that a meaningful agreement between resident and nonresident companies in the forum state is enough to warrant personal jurisdiction.   See Cognex Corp. v. Lemelsen Med., Educ. & Research Found., Ltd. P'ship., 67 F.Supp.2d 5, 9 (D.Mass. 1999) (holding that personal jurisdiction is proper where business agreements constitute clear contacts with the forum);[11] Abbott Labs. v. Mylan Pharms., Inc., 05-CV-6561, 2006 WL 850916 (N.D. Ill., Mar. 28, 2006) (holding that jurisdiction is proper where defendant maintains business agreements with seven companies with their

---

[11] ATT-M argues that Cognex Corp. is inapplicable because the court dismissed the case for lack of personal jurisdiction after finding the agreements did not constitute minimum contacts in the forum.   (Docket No. 139 at p. 11.)   That statement is not correct. In reality, the court found that "[i]n the instant case, unlike in Red Wing, it is clear that [defendant's] non-exclusive licencing agreements with Massachusetts companies constitute contacts with the forum."   Cognex Corp., 67 F.Supp.2d at 9.   Rather, the court dismissed the claim not because contacts were lacking, but because the claim did not arise from or relate to those contacts pursuant to the second prong of the specific jurisdiction test.   Id.   ("It is unclear, however, whether the present action arises out of or relates to those contacts . . . .   As such, Cognex's cause of action cannot be said to arise out of or relate to [defendant]'s licenses.")

principal place of business in the forum).  Thus, we find that the
agreement between ATT-M and ATT-MPR, which specifically concerns
substantial business in the forum state, shows purposeful activity
on the part of ATT-M.

           Finally, ATT-M targets residents of Puerto Rico
via the AT&T Web site.  As we have discussed above, the Web site is
clearly "designed and intended" to reach the forum of Puerto Rico,
Toys "R" Us, 318 F.3d at 454, and its interface reflects
specifically intended interaction with forum residents, CompuServe,
89 F.3d at 1264-66.  That ATT-M acts through the AT&T Web site is
clear enough from the wireless service page, which states, "Service
provided by AT&T Mobility."  (Docket No. 120 at p. 10.)  Moreover,
the Web site makes available WCAs to which ATT-M is a party, and
"AT&T Mobility" is identified as a service provider on the coverage
maps for Puerto Rico.  (Docket No. 130 at p. 13.)  Though the Web
site is "generally available to anyone who has access to the
Internet," (Docket No. 128 at p. 12), it is more than just a
passive site.  Therefore, we find that it conducts purposeful
activity directed at the forum.

           In sum, it is reasonable to infer from ATT-M's
multitudinous contracts with residents of Puerto Rico, its
meaningful business relationship with ATT-MPR, and the business it

conducts with Commonwealth customers via the AT&T Web site, that ATT-M purposefully directs activity at the forum.

   **b.** **Claim Arises From or Relates to Activity**

    ATT-M contends that plaintiff's claim does not arise out of or relate to ATT-M's alleged activity in Puerto Rico. (Docket Nos. 128 at pp. 17-18; 139 at 13-14.)  Essentially, ATT-M falls back on its initial insistence that it conducts no business at all in the Commonwealth, and therefore that there is no activity from which the claim can conceivably arise.  (Docket Nos. 128 at p. 17; 139 at 13.)  Because this Court has found that ATT-M *does* purposefully direct activity toward the forum of Puerto Rico, however, ATT-M's argument is rendered nonsensical.  For the reasons adumbrated below, this Court determines that plaintiff's claim clearly arises out of and relates to ATT-M's activity in the Commonwealth.

    Although the nexus necessary to satisfy the "arise out of or related to" requirement has not been clearly delineated by the Supreme Court, the United States Court of Appeals for the Federal Circuit has stated that the phrase is disjunctive in nature, indicating an added flexibility.  Avocent Hunstsville Corp. v. Aten Intern Co., Ltd., 552 F.3d 1324, 1330 (Fed. Cir. 2008) (citing Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1362 (Fed. Cir. 2001)); see Helicopteros Nacionales, 466 U.S. at 415.  In a

patent suit like this one, the inquiry is easily discerned from the nature and extent of the commercialization of the patented product or service by defendant in the forum.  Id. at 1332.  Thus, a plaintiff's claim may "arise out of" or "relate to" a defendant's alleged manufacturing, using, or selling of the claimed invention. Id.  While there is currently no evidence that ATT-M manufactures the mobile devices and wireless services that allegedly infringe upon plaintiff's patented technology, it is evident that ATT-M has a hand in selling or providing those devices and services to the public.  First, it is undisputed that ATT-M enters into WCAs with AT&T customers in Puerto Rico.  (Docket No. 54-2.)  The WCAs include a balance statement for wireless service, instructions to send payment directly to ATT-M's corporate address in Atlanta, GA, and an arbitration agreement invoking Puerto Rico law.  Id. According to ATT-M's own associate counsel, "all customers must agree to a WCA that sets forth or incorporates by reference the terms and conditions of service" as a condition of receiving wireless service from ATT-M.  (Docket No. 130-2 at p. 5.) Moreover, ATT-M admits to a business arrangement with ATT-MPR that ensures ATT-MPR will provide wireless services in Puerto Rico. (Docket No. 128 at p. 10.)  ATT-M may attempt to obfuscate its role in selling and providing wireless services to Puerto Rico customers as much as it likes, but the evidence before the Court is clear;

therefore, plaintiff's claim arises from and relates to ATT-M's role as a provider and seller of these services.

### c.   Reasonable and Fair

ATT-M contends simply that because it lacks minimum contacts with Puerto Rico, subjecting it to jurisdiction would be neither reasonable nor fair; no other argument is offered. (Docket No. 128 at p. 18.)  As we have determined, however, ATT-M *does* have minimum contacts with the Commonwealth, and plaintiff's claim arises from and relates to those contacts.  This leaves ATT-M with little ground to stand on. We find now, without substantial protest from ATT-M, that subjecting it to jurisdiction in this Court would indeed be fair and reasonable.

"Once it has been decided that a defendant purposefully established minimum contacts with the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Burger King Corp., 471 U.S. at 476 (citing Int'l. Shoe, 326 U.S. at 320). Relevant factors include:  (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest

of the several states in furthering fundamental substantive social policies.  Id. at 477 (citing World-Wide Volkswagen, 444 U.S. at 292).  "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.  On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  Id. at 477 (internal citations omitted).

        As noted, ATT-M provides no compelling case against the reasonableness of jurisdiction in Puerto Rico.  We look, then, to plaintiff's argument in favor of jurisdiction.  It is clear from this argument that litigation in Puerto Rico would not present an overwhelming burden to ATT-M; indeed, AT&T has touted itself as "one of the premiere telecommunications companies in the United States and throughout the world . . ." and should have little trouble representing itself in the Commonwealth. (Docket No. 130 at p. 20.)  Moreover, because plaintiff sues several AT&T entities at once, separate trials "would require duplicate efforts by [plaintiff] and the court system and would result in overlapping and potentially contradictory rulings." Id. Granting jurisdiction in Puerto Rico, then, would ensure efficiency

and "relieve parties of the cost and vexation of multiple lawsuits, converse judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Carson v. Dept. of Energy, 398 F.3d 1369, 1375 (Fed. Cir. 2005) (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980) (internal quotations omitted). The Court agrees with plaintiff, and thus holds the exercise of personal jurisdiction over ATT-M to be reasonable and fair.

In sum, the Court finds there to be sufficient reason to exercise specific jurisdiction over defendant ATT-M. As ATT-M maintains minimum contacts within Puerto Rico, and adjudication in the forum would not offend fair play and substantial justice, we see no reason that ATT-M should not be required to defend itself in this Court. Therefore, we **DENY** ATT-M's motion to dismiss.

**B.    ATT-I**

Defendant ATT-I objects to the magistrate judge's finding that there are sufficient facts to support specific jurisdiction. (See Docket Nos. 127 & 138.) As noted above, the Court of Appeals for the Federal Circuit applies a three-prong test when determining whether the application of specific jurisdiction satisfies the requirements of Due Process. Breckenridge Pharm., Inc., 444 F.3d at 1362-63; Akro Corp., 45 F.3d at 1545. We address each prong in

turn, and conclude that ATT-M is properly subject to specific jurisdiction.

### i.   **Purposefully Directed Activity**

ATT-I argues that it has not directed any activities toward the forum of Puerto Rico, because ATT-I "is a holding company that does not directly conduct business with or provide services to the public." (Docket No. 77 at p. 5.)  Moreover, ATT-I argues that without the existence of an alter-ego or agency relationship between ATT-I and ATT-MPR, the activities of ATT-MPR are irrelevant to a minimum contacts analysis.  Id. at 10; see Escude Cruz v. Ortjo Pharm. Corp., 619 F.2d 905-06 (1st Cir. 1980). In her R&R, the magistrate judge considered voluminous evidence of business contacts between ATT-I and Puerto Rico.  (Docket No. 120 at p. 12.)  Most compelling, according to the magistrate judge, is an array of Federal Communications Commission ("FCC") filings by ATT-I that point to its direct role in negotiating a 2009 merger with Centennial Communications Corp. ("Centennial") in Puerto Rico.[12]   (Docket Nos. 120 at p. 13; 83-2, 83-6 & 83-8.)   In addition, there is evidence of business conducted by ATT-I in Puerto Rico *before* the merger; this evidence purportedly shows ATT-

---

[12] The merger between AT&T and Centennial led to the creation of ATT-MPR and the establishment of WCAs with 440,000 customers in Puerto Rico.  (Docket No. 54-4 at ¶ 7.)

I's close ties with America Movil, then a wireless carrier doing business in Puerto Rico, as well as ATT-I's possession of certain node and submarine cable interests in Puerto Rico.   (Docket Nos. 83-2, 83-16 & 83-18.)   We consider in turn the merger and pre-merger evidence of ATT-I's contacts with Puerto Rico.

### a.   Merger-Related Evidence

Defendant ATT-I objects to the finding that ATT-I's role in negotiating the Centennial merger is compelling evidence of its activity in Puerto Rico.   (Docket Nos. 127 at pp. 8-11; 120 at p. 13.)   The magistrate judge noted that "merger negotiations can constitute actions directed towards a forum state for the purposes of personal jurisdiction, especially where, as here, the merger agreement affected the forum state."   (Docket No. 120 at p. 18.)   See Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp., 394 F.Supp.2d 299 (D.Mass. 2005).   Specifically, the magistrate judge found that ATT-I's senior executives were "intimately involved in the planning, negotiation, and execution of the merger," and that ATT-I committed its operating subsidiaries in Puerto Rico to certain conduct.   Id. at p. 14.   Rather than dispute these facts, ATT-I contends that its negotiations with Centennial are insufficient to demonstrate purposeful activity because the negotiations "did not create any continuing obligation of ATT-I in

Puerto Rico."  (Docket No. 127 at p. 10.)  We find this argument
unavailing.

The Court has already noted that the mere
existence of a contractual relationship is not enough to establish
minimum contacts between a nonresident corporation and a forum
state. Burger King Corp., 471 U.S. at 478.  Rather, "[i]t is these
factors – prior negotiations and contemplated future consequences,
along with the terms of the contract and the parties' actual course
of dealing – that must be evaluated in determining whether the
defendant purposefully established minimum contacts with the
forum." Id. at p. 479.  Therefore, where a corporation, through
its interstate contractual obligations, reaches out beyond one
state and creates beneficial contacts with citizens of another
state, it is "subject to regulation and sanctions in the other
state for consequences of [its] activities." Id. at p. 473
(quoting Travelers Health Assn. v. Va., 339 U.S. 643, 647 (1950)
(internal quotation marks omitted). See Kulko v. Cal. Super. Ct.,
436 U.S. 84, 96 (1978); Quill Corp. v. N.D., 504 U.S. 298, 307
(1992); Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d
284, 292 (1st Cir. 1999).

We have no doubt that ATT-I purposefully
reached out to Puerto Rico to establish a long-term, beneficial
relationship with its citizens.  In Wolverine, the district court

found that through its continuing negotiations concerning a merger with the plaintiff, the defendant deliberately reached out and created contacts with the forum.  394 F.Supp.2d at 310.  Indeed, personal jurisdiction was found to be proper even though the parties did not follow through with the agreement.  It requires no great conceptual leap, then, to say that ATT-I purposefully directed activity at Puerto Rico by negotiating and executing a merger with Centennial that had a profound effect on residents of the forum.  Moreover, once the merger was approved by the FCC, ATT-I benefitted substantially, both long- and short-term, from the "contemplated future consequences" of the agreement.  Burger King Corp., 471 U.S. at 479.  By its own admission, ATT-I intended to benefit from the merger by:  transferring Centennial's licences and assets to itself; increasing ATT-I's presence in Puerto Rico by establishing a subsidiary, ATT-MPR, that would adopt Centennial's 400,000 customers pursuant to ATT-I's corporate policies (at great economic advantage to ATT-I); providing former Centennial customers with increased availability of international roaming, along with more application and network options; better serving the company's existing enterprise customers with operations in Puerto Rico and competing for additional business there; demonstrating ATT-I's general commitment to rural coverage by enhancing its network coverage; expanding ATT-I's wireless footprint, thereby making it

more attractive to business customers who demand an integrated provider; and taking advantage of a "deal [that] makes financial sense for AT&T and will create value for [its] shareholders, with synergies expected in areas including overhead, advertising, customer care and network operations." (Docket Nos. 83-2 & 83-4.)

The Court finds that this long list of consequential benefits amply demonstrates ATT-I's decision to reach out to Puerto Rico purposefully and establish long-term contacts there. See Kulko, 436 U.S. at 96 (holding that defendants ought to be held accountable in the forum state if they purposefully derive benefit from their interstate activities); Quill Corp., 504 U.S. at 307 ("[I]f a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State, it may subject itself to the State's *in personam* jurisdiction even if it has no physical presence in the State."); Phillips Exeter Acad., 196 F.3d at 292 (holding that personal jurisdiction is proper when a defendant benefits from its contacts with a forum in a way that made jurisdiction foreseeable).  It makes no difference that ATT-I's subsidiary, ATT-MPR, maintains its own contacts with the Commonwealth; rather, it was ATT-I which negotiated and entered into an agreement with Centennial, and it is ATT-I which reaps the continuing benefits of that transaction.  In no way can these benefits be imputed to ATT-MPR; for instance, ATT-I's ability to

demonstrate its commitment to rural coverage, expand the company's larger wireless footprint, and create value for ATT-I's shareholders are all benefits *specific* to ATT-I as a larger corporation.  The Court therefore rejects ATT-I's contention that its negotiations and subsequent agreement with Centennial do not constitute contacts with the forum.

### b.  Pre-Merger Evidence

Defendant ATT-I also objects to the magistrate judge's finding that ATT-I's pre-merger activity constitutes compelling evidence of its contacts in Puerto Rico.  (Docket Nos. 127 at pp. 8-11; 120 at p. 13.)  The magistrate judge found that before the Centennial merger, ATT-I provided management services under an agreement with America Movil, then a wireless carrier doing business in Puerto Rico.  (Docket Nos. 120 at p. 15; 83-2 at p. 5.)  Pursuant to this agreement, ATT-I had the right to appoint two members of America Movil's corporate board, and it regularly assigned its own high-ranking executives to those positions.  (Docket Nos. 120 at p. 15; 83-18 at p. 7.)  It is notable, indeed, that "the FCC found that the two companies' relationship was significantly close that, given the Centennial merger, it might have created anti-competitive harms . . ."  (Docket No. 120 at p. 16; see also Docket No. 83-2 at p. 9.)

ATT-I is quick to point out that the FCC filings establish only that "AT&T Mexico, Inc. – and not ATT-I – had a relationship with American Movil, that the relationship was in Mexico, and that the agreement between AT&T Mexico and America Movil expressly precluded the provision of services to any America Movil subsidiary with operations in the United States." (Docket No. 127 at p. 11.) Indeed, the second amendment to the agreement stipulates that

> [a]n 'AMERICAN MOVIL Subsidiary' is defined as a corporation (or similar entity) (y) whose operations are completely limited to one or more of the following countries: Mexico, Guatemala, Nicaragua, El Salvador, Ecuador, Colombia, Brazil, Argentina . . . For the avoidance of any doubt, subsidiaries or affiliates of AMERICA MOVIL that fail to fully satisfy the definition of an AMERICA MOVIL Subsidiary (including without limitation, any subsidiary with operations in the United States) shall not be entitled to receive services or information under the Agreement.(Docket No 127-2 at p. 19.)

All of this might be convincing if ATT-I had not previously admitted to providing services to America Movil in Puerto Rico. For example, in response to an FCC information request, ATT-I conceded that after America Movil acquired Telecomunicaciones de Puerto Rico in 2007, ATT-I "provided services to America Movil in Puerto Rico" on several occasions. (Docket No. 83-18 at p. 10.) It is telling that ATT-I conspicuously fails to address this revelation in its reply in support of its objections to the R&R.

(Docket No. 138.)  Revealing, also, is ATT-I's failure to explain its apparent "commitment" to the FCC's condition that it limit its "participation in the business and operations of America Movil in the United States (including Puerto Rico and the U.S. Virgin Islands)" before merging with Centennial.  (Docket No. 83-2 at p. 4.)  The Court finds this commitment to be sufficient evidence of ATT-I's contacts with Puerto Rico before its merger with Centennial.

          In addition to ATT-I's agreement with America Movil, plaintiff provides snapshots of ATT-I's alleged contacts in the forum that, when viewed together, form a clear picture of the company's purposeful activity in Puerto Rico before its merger with Centennial.  First is ATT-I's contested ownership of a node and submarine cable assets in Puerto Rico.  (Docket No. 120 at p. 15.) It is difficult to determine from the limited and contradictory evidence supplied by both parties whether the equipment was used for "wireline" or "wireless" service, and, moreover, whether ATT-I

actually owned it or simply had access to it.[13]  (Docket Nos. 127
at pp. 7-8; 131 at pp. 14-16; 138 at p. 11.)  Nonetheless, we
detect enough portent in ATT-I's admission that it had "presence"
in Puerto Rico to forgo discounting this evidence outright.  In
fact, we are better able to divine ATT-I's relation to the node and
submarine equipment when we consider its former contention, found
in the FCC filings, that a merger with Centennial will allow ATT-I
to "better serve the company's existing enterprise customers with
operations in Puerto Rico and compete for additional business with
the rise range of businesses with a presence there . . . " (Docket
No. 83-4 at p. 3.)  That ATT-I hoped to "better serve its existing
customers with operations in Puerto Rico" by merging with
Centennial certainly suggests that the company had contacts in the
forum leading up to the merger.  Id. at p. 4.

---

[13] Indeed, the complicated question of ATT-I's relation to
these assets arises from an innocuous passage found in the FCC
filings, where ATT-I reveals – perhaps unwittingly – that it
"currently lacks a wireline network presence in Puerto Rico (other
than a node and submarine cable assets) and must rely on third
parties for on-island connectivity." (Docket No. 83-16 at p. 4.)
Much is made of this statement by plaintiff, with both parties
eventually endeavoring to parse the language and speculate on the
very nature of "presence" itself, all in a manner more reminiscent
of Heidegger than anything found in the case law.  Of course,
despite their foray into ontology, neither party is able to show,
one way or the other, whether ATT-I actually owned the assets, or
what purpose this equipment might serve in relation to AT&T's
wireless coverage in Puerto Rico.

In sum, we find that ATT-I has purposefully directed activities toward the forum of Puerto Rico. First, its negotiation and execution of a merger with Centennial shows that ATT-I purposefully reached out to Puerto Rico to establish a long-term, beneficial relationship with its citizens. See Burger King Corp., 471 U.S. at 473; Kulko, 436 U.S. at 96; Quill Corp., 504 U.S. at 307; Phillips Exeter Acad., 196 F.3d at 292. Moreover, there is evidence of ATT-I's pre-existing contacts with Puerto Rico, most notably an agreement with America Movil whereby ATT-I provided services in Puerto Rico. Combined, this evidence leaves little doubt that ATT-I has purposefully availed itself of the forum of Puerto Rico.

### ii. Claim Arises From or Relates to Activity

ATT-I contends that plaintiff's claim does not arise out of or relate to ATT-M's alleged activity in Puerto Rico. First, ATT-I avers that "participating in negotiations is not an infringing activity under the Patent Act." (Docket No. 127 at p. 19.) But by focusing purely on the negotiations between ATT-I and Centennial, ATT-I plainly ignores the fact that an agreement was reached between the two parties that led to a corporate merger

with far-reaching affects within the forum.[14]  Moreover, once it has directed our attention to the Patent Act, ATT-I fails to point out any language in the statute that precludes the consideration of negotiations or corporate mergers as infringing activity.  In fact, there is no such language.

Rather, Section 271(b) of the Patent Act states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  In Global-Tech Appliances, Inc. v. SEB S.A., the Supreme Court held that a defendant induces infringement when it encourages another entity to infringe on a patent while knowing that the act constitutes infringement.  131 S.Ct. 2060, 2068 (2011) (defendant knowingly infringed a patent on a kitchen appliance, but did not apprise third parties selling the appliance).  In this case, plaintiff submits evidence allegedly showing that ATT-I knowingly infringed on several of its patents.  (Docket No. 49 at ¶¶ 22 & 38.)  By negotiating and executing the merger with Centennial, and by establishing ATT-MPR in Puerto Rico, ATT-I also knowingly created

---

[14] Also, despite ATT-I's carping, negotiations can indeed be considered in a patent infringement claim.  See MEMC Elec. Materials, Inc. v. Mitsubushi Materials Silicon Corp., 420 F.3d 1369, 1376 (Fed. Cir. 2005) (considering negotiations as evidence of infringement); Wing Shing Prods. (BVI), Ltd. v. Simatelex Mfg. Co., Ltd., 479 F.Supp.2d. 388, 406 (S.D.N.Y 2007) (considering the forum for negotiations when determining infringement).

a situation in which patent-infringing products and services were sold to customers in the Commonwealth by ATT-I's subsidiaries. We find, therefore, that AT&T actively induced infringement of the various patents in suit within Puerto Rico. For this reason, it is evident that plaintiff's claim arises from and relates to ATT-I's activities in the forum.

### iii. Reasonable and Fair

Much like ATT-M, ATT-I contends that because it lacks minimum contacts with Puerto Rico, subjecting it to jurisdiction would be neither reasonable nor fair. (Docket No. 127 at p. 24.) As we have determined, however, ATT-I *does* have minimum contacts with the Commonwealth, and plaintiff's claim arises from and relates to these contacts. This leaves ATT-I, like ATT-M before it, with little ground to stand on. We find that subjecting ATT-I to jurisdiction in this Court would indeed be fair and reasonable.

ATT-I protests that it is merely a holding company that produces no goods or services, and that in exercising jurisdiction over ATT-I, the Court would "effectively render the corporate form meaningless . . ." Id. This protest is simply not true. Despite what ATT-I might think, the Court came to its conclusion without piercing the corporate veil or in any way attributing to ATT-I the acts of its subsidiaries. Therefore, ATT-

I's evocation of the agent or alter-ego theory is rendered moot; at no point does the Court suggest that ATT-I controlled the actions of others.   Rather, the Court finds ATT-I subject to personal jurisdiction based solely on its own activities in the forum.

As ATT-I provides no compelling case against the reasonableness of jurisdiction in Puerto Rico, we look to plaintiff's argument in favor of jurisdiction.   Plaintiff offers the same argument against ATT-I as against ATT-M.   It is clear from this argument that litigation in Puerto Rico would not present an overwhelming burden to ATT-M.   (Docket No. 131 at p. 19.) Moreover, because plaintiff sues several AT&T entities at once, separate trials "would require duplicate efforts by [plaintiff] and the court system and would result in overlapping and potentially contradictory rulings." Id.  Granting jurisdiction in Puerto Rico, then, would ensure efficiency and "relieve parties of the cost and vexation of multiple lawsuits, converse judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Carson, 398 F.3d at 1375.  We find this argument convincing, and thus we hold the exercise of personal jurisdiction over ATT-I to be reasonable and fair.

In sum, we find there to be sufficient reason to exercise specific jurisdiction over defendant ATT-I.   As ATT-I maintains minimum contacts within Puerto Rico, and adjudication in

the forum would not offend fair play and substantial justice, we see no reason that ATT-I should not be required to defend itself in this Court.   Therefore, we **DENY** ATT-I's motion to dismiss.

## IV.  Conclusion

The Court has made an independent examination of the entire record in this case, including plaintiff's objections to the R&R and defendants' opposition to those objections, and **ADOPTS IN PART AND DENIES IN PART** the magistrate judge's findings and recommendations as the opinion of this Court.   Regarding ATT-M, the Court finds that specific jurisdiction is proper and therefore **REJECTS** ATT-M's motion to dismiss.   Regarding ATT-I, the Court also finds that specific jurisdiction is proper and therefore **DENIES** ATT-I's motion to dismiss.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 24, 2012.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE